Good morning, your honors. David Husky on behalf of appellant Debbie Morris on appeal from the denial of qualified immunity in the district court. I would like to reserve two minutes for rebuttal if I may. Placer County emergency response social worker Debbie Morris is before this court today because she believed what a battered eight-year-old boy told her and acted on it under significant time pressure. Christian Springer told her a Dickensian scenario of abuse by a physical abuse by his adoptive father. He had marks on his face that corroborated what he told her and he also told her I think probably most critically that he was afraid to go home because his father might hurt him. Ms. Morris believed what he told her and what he showed her and therefore acted by not allowing him to board the school bus that was arriving on February 1st 2005 at 245 p.m. Were those the marks on the bitch nose, stops on the face and three stops on the of itself in terms of that would not require him to go to the hospital, no. However, it's a sign of very significant risk. And what Ms. Morris has, it's not that alone. It is that and that it's happened before and that he's afraid to go home. An adult male... Were just his being afraid to go home, would that be justification for an arrest? Probably not. But again, I think it's taking the whole scenario, the whole picture. And again, this call arrives at 145 and it takes some time to get to the school, some time to interview the child. She calls her supervisor, calls County Council, school bus is coming. And I do think it is a critical factor here that the victim is complaining because in the court in Mabe, I don't know if it's Mabe or maybe, but Mabe v. County of San Bernardino talks about the fact that it is a complaint from a victim is far more compelling than a report from a third party or an anonymous source. And in terms of reasonable cause to believe that there's been a past injury and potential future injury. And I do think the fact that the child was afraid combined with the slaps and the pinch and his saying that it happened before in combination, that was enough to be concerned, to have reasonable fear or reasonable cause to believe that the child faced imminent, serious bodily harm. Didn't the child indicate that the spanking had been enough that he was uncomfortable sitting down? Yes, he said he'd been spanked so hard that he still had trouble sitting down that day. I'd like to point out also in Ram v. Rubin And this was reported to your client initially by a teacher? The teacher, yes, the teacher at the school, I'm not sure if it was actually the teacher reported it or somebody else, but it was the second grade teacher who noticed and then put the wheels in motion. And it was reported from the school to CPS. This was a teacher who knew the child? Yes, it was the class teacher. Observed the child over time? Yes. The court in Ram v. Rubin talked about, made a distinction between actions of a supervisor with time to review as being distinct from the actions of a frontline social worker who has to make split second judgments. Now, this may not be quite split second judgments, but they were certainly judgments under significant time pressure. And in Ram, the court noted that the supervisor had, in that case, a couple of years to decide what to do with an old complaint of sexual abuse and then decided against the advice of the frontline social worker to go take the children away. Here, Debbie Morris was the frontline supervisor, the emergency, I'm sorry, the emergency response social worker who was out there making those calls in the field. And that's a difficult position to be in. I have a question with regard to one thing to keep a person off the bus and because of an emergency, but how about the hour or so that transpired before the child was taken to the reception area? Well, during that hour or so, she continued to investigate. One, she had called the police officer who came and he investigated and interviewed the child. But she talked to the teacher, Patricia Shire. And during that time, Ms. Shire gave her more information about how he's an emotionally disturbed child. He was angry. He'd brought box cutters to school before. He'd threatened to commit suicide. He'd been in fights with other children. This was a very, very troublesome child when combined with a father. And also an important piece of information there was she said that both the father had said the parents were at their wits end in dealing with this child. And didn't say I was at my wits end. The report was the parents are at their wits end or we are at our wits end. Again, she learned more information indicating this was a potentially very volatile situation. And again, I think that enforced her need to act. You know, the issue in part is there was probably time to get a warrant and had this county properly advised its people that that was what they should do? It's undisputed that the county had trained her on the constitutional standards under Wallace. That's an undisputed fact on the record. And when you say that she had time to get a warrant, I believe the facts are that it would have taken I think her statement is a minimum of two hours to obtain a warrant to board the school bus. I mean, she had less than that. I read this in the school bus problem, but there was time between not letting him board the bus and taking him to the receiving hall. There was a period in there where she was investigating. I would submit, Your Honor, that even that time was very, very close because the testimony is it would have taken a minimum of two hours, which means it could take longer. And again, this scenario starts at close to 2 o'clock in the afternoon. But she had him all that time. She had him during the time that they took him off the bus. Why wasn't there time before she took him to the reception? Well, Your Honor, I believe at that point, well, first of all, again, it was a two-hour minimum. It certainly could have taken longer than two hours, so she would be guessing whether she would get a warrant in time. Secondly, I believe she had reasonable cause already to believe that the child had been abused and faced imminent risk of serious abuse had the child returned home on the school bus. And it's an interesting scenario because you're saying, and I raise this in my brief because I'm not clear whether preventing him from getting on the school bus was taking him into protective custody or if it was the later act of actually taking him home. Again, I'm not sure the law is clear on that. She may have already had him in custody at that point. I'm sorry. That's all right. Finish your thought. I think I had finished my thought, so thank you. Thank you. You've got about a minute and a half for rebuttal. Thank you. Counsel? Thank you, Your Honor. May it please the court, I'd like to initially move for an injunction against that drilling, but I probably don't have jurisdiction. How much we can do about that? No jurisdiction. As Judge Hugg mentioned, this is a case where there simply was no bodily, no serious bodily injury. The fact that there was even a mark on the cheek is disputed by the teacher herself who says that she only saw the mark on the nose. That's in my excerpts of record of her deposition testimony. So we have a slightly reddened nose, and then there's a claim about a spanking on the butt. But also the teacher, Ms. Scher, mentions that when she comes to the office after the child's already been taken into protective custody, she actually started in the morning. The child was in the classroom right up the morning, and the teacher noticed the redness in the nose and sent him to the office and spoke to the principal. So he'd been in the office, and then he's described not only as sitting in chairs for hours, but as playing with toys and coloring and moving about quite freely. There's no time pressure element here because you have to weigh that against what are the injuries we're looking at. And what we're looking at here is a slightly reddened nose. Whatever spanking they thought occurred, nobody bothered to take a look. The alleged two-finger handprint, which through my own error I can't provide you the color photograph of, which doesn't show it, is nothing in the realm of serious bodily injury. It's certainly nothing in the realm of assassination of a president or bombs at a large public gathering. And that's the ratcheting up that the social worker has done, and that's the ratcheting up that's being done in this case in order to say there was a time pressure. There was no time pressure. In the state of California, as in every state governed by federal law, which I believe is all of them, it's required that they have a judge on staff 24-7 to issue EPROs, emergency protective restraining orders. You pick up the phone and you call them and you get them. So if there's really a legitimate belief, which I don't share, that John Springer posed a threat to his child in terms of serious bodily injury, then you could have gotten an EPRO. And all this talk about they were married, they might lie goes out the window. I don't believe that this child should have been removed from John Springer at all, but I think the facts are abundantly clear that Cassandra Springer certainly should have not had her child removed. This was an extremely rash thing, and the only evidence in this record about when this child was taken into custody comes from the school secretary, Ms. Gobel, also in the experts' records. She says she spoke to Christian, meaning Ms. Morris, spoke to Christian, walked out, spent about ten minutes on the phone, came in, took him into protective custody. Now, if that's the state of affairs in this country, in this circuit, we're going to have teenagers lining up to get out of situations with stepfathers, usually, they don't like. We're going to have them change their lot, saying whatever they need to say, because a social worker is going to come in and say, that's it, that's all I need to know. This isn't a Ram versus Rubin situation, which defendants cite, in terms of corroborating the injury. They talked to the child, he said these things, that was it. Take him into protective custody. Well, look at it from the standpoint of the social worker. Her obligation is to make sure that he saw it, had red marks on his face, and that he had been spanked. He had a drunken stepfather. He was afraid of him. And the child was afraid to go home, and was afraid if he'd had any contact with the police or authorities, that it would be all the worse with his father. Now, that's what she was seeing. And I think you can't say there's any motivation, from an IRP standpoint, other than to protect this child. Now, on the other side, there's a parent who has rights to have their children not taken away from them without good cause. So we try to balance these things. And something that really didn't happen at the district court was after a determination that constitutional rights were violated, could the social worker reasonably have thought that this child was in danger? And that I don't think was ever determined, was it? No, it wasn't. And that brings me to a first, and I will address some of the other things Your Honor said, but we're here on a case where the district court determined a triable issue of material fact. And our first argument in our brief, and mentioned a couple more times in the hopes that it carries more weight, is that this court doesn't have jurisdiction in this type of a situation. When the district court determines there's a triable issue of material fact, we go forward in the Now, you did mention at first I was concerned because you said they're trying to protect, but there is that balancing. And it's a significant balancing. And in this case, it's completely not considered. There's no sign from this social worker's action that she gave a moment's thought to the familial association rights of this family. She immediately jumped the gun and took this child. And there was time while the child was on the bus to call mother or father and maybe talk to them. Let's assume there was a constitutional violation by the social worker. What's the clearly established right? The clearly established right is to be free from governmental interference and not have your children taken unless there's an imminent risk of bodily injury. And I believe that as the law says, the contours of the right need to be clearly established. And I think those rights are clearly established. Because as the first question from Judge Hugg indicated, where was the serious bodily injury in this? So that's kind of a defining parameter right off the bat. There was no serious bodily injury. The penal code has a definition of they don't use serious bodily injury. They use severe. And they talk about deep bruising, lasting injury. The welfare institution code section 305 that allows police officers to remove children requires that they be in a condition that they need medical help. This happened in February of 2005? Yes, Your Honor. At that time, what case or cases would have told the social worker that she needed to make a determination of serious bodily injury before moving to protect the child? They start with Ram versus Rubin. Then it proceeds to Wallace. Then it proceeds to Mabe. Those are the three that I know off the top of my head that all occurred before 2005. Yes, those would be the three that I know for sure before 2005. All of those say in the absence of proof of serious bodily injury, the social worker cannot act. Cannot act without a warrant. Or, you know, when there's time to get a warrant. Rubin, the case of Rubin, uses the word physical harm, I believe. But then it's changed to serious bodily injury and has remained that right through Rogers versus San Joaquin, a fairly recent decision. Is there a difference between taking a child from the home as opposed to stopping a child from getting on a bus? No. And I didn't ‑‑ I can't say that I really agree with, maybe I should admit not quite understand the argument that was made in defendant's brief about the school issues. None of those cases were comparable to my mind in any way. They were all quite different about the detention right against the individual child. And as I pointed out in the brief, and I don't point it out to be sarcastic or ironic, every one of those cases, they spoke to the parents. And one of the larger cases that he cites or one of the more important cases he emphasizes, they brought the parents in and had like a town hall meeting with them and consulted them. And, you know, that's a basic dignity in this world is when you're going to raise your children and the government's thinking there might be something wrong, they owe you the decency of speaking to you. And so when I ask in my brief that I would like to see a federal law that says speak to those parents. Do not jump the gun as happened in this case. It's in our California law, and it's not as defendant represents it to you. If you look at 31.125, and I realize you don't have to follow California law, I'm going out on a limb and asking you to say this for this circuit as well, the two paragraphs about speaking to the children and speaking to the parents, one follows the other. Defendants are attempting to tell you that apparently there's something called a child abuse. That's not in this regulation. It's all the investigation. I don't have rebuttal. Never mind. So I think it would be a very important step in this process because there are many things that are happening out here right now in the juvenile dependency system that need to be addressed, and this is one that certainly would probably save some families a lot of grief. Like Judge Reinhart said in Wallace, you can create deleterious effects for not just the child, but the entire family. That's what happened here. Okay. Thank you. Thank you for your argument. Rebuttal? One, I don't believe the law is that there has to have the serious bodily injury has to have already occurred. At that point, it's too late. There has to be a reasonable belief that it might occur in the future. So the fact that there were only slaps at this point doesn't mean that a social worker didn't have a reasonable belief that it would occur in the future, given the child's fear. Secondly, qualified immunity is very important in this case. The social worker doesn't have to be correct. Qualified immunity applies to all but the plainly incompetent and those who knowingly violate the law. It's clear that she knew the law, and I don't think there's any contention that she knowingly violated it. So the only question here is, was her conduct so off the mark in light of published California, published Ninth Circuit case law that you could conclude that she was plainly incompetent in what she did? I respectfully submit that at worst, this was a close and difficult call for someone to make in the field under limited time. If this case were sent back for trial and evidence was laid out, the district court could still grant qualified immunity prior to the case going to the jury, correct? It could, but that would defeat the purpose of qualified immunity, which is to resolve basically close calls like this before trial. And a public official shouldn't have to stand trial when it's not clear what they did was unlawful. Okay. Thank you. Good timing. Thank both sides for their argument. The case disargued will be submitted for decision, and the court for this session will stand adjourned. All rise.
judges: Hug, Fletcher B. , Hawkins